WEEKS *v.* BRIDGMAN.

ERROR TO THE SUPREME COURT OF THE STATE OF MINNESOTA.

No. 44.  Argued October 17, 1895. — Decided November 11, 1895.

In 1857 B., a mail contractor, applied to file a preëmption declaratory statement for public land under the act of March 3, 1855, c. 201, 10 Stat. 683. His application being rejected he appealed to the Commissioner of the General Land Office, by whom the decision below was sustained. He then appealed to the Secretary of the Interior, who in 1861 reversed the Land Commissioner's decision. Meanwhile, in 1860, Congress passed an act for his relief, (12 Stat. 843, c. 63,) and under that act he paid for the land, and in 1871 received a patent in which it was stated that the land had been certified to the State of Minnesota for railroad purposes by mistake. This certification was made in 1864. *Held,* as between the grantee of B. and the grantee of a railroad company to which the land had been conveyed by the State, that the title derived from B. must prevail.

THIS was an action brought by Charles A. Weeks against Coleman Bridgman in the District Court for the Seventh Judicial District of Minnesota under a statute of that State to determine adverse claims to vacant and unoccupied real estate. Judgment having been rendered for plaintiff, the cause was taken to the Supreme Court of Minnesota on appeal, the judgment reversed, and the cause remanded. 41 Minnesota, 352. The cause was again tried in the District Court by the court, a jury having been expressly waived, and judgment entered for defendant, which, on a second appeal, was affirmed.

46 Minn. 390. To this judgment the pending writ of error was allowed.

The facts were in substance as follows:

By act of Congress of March 3, 1857, c. 99, 11 Stat. 195, there was granted "to the Territory of Minnesota, for the purpose of aiding in the construction of railroads, from Stillwater, by way of Saint Paul and Saint Anthony, to a point between the foot of Big Stone Lake and the mouth of Sioux Wood River, with a branch via Saint Cloud and Crow Wing, to the navigable waters of the Red River of the North, at such point as the legislature of said Territory may determine; . . . every alternate section of land, designated by odd numbers, for six sections in width on each side of each of said road and branches; but in case it shall appear that the United States have, when the lines or routes of said roads and branches are definitely fixed, sold any sections, or any parts thereof, granted as aforesaid, or that the right of preëmption has attached to the same, then it shall be lawful for any agent, or agents, to be appointed by the governor of said Territory or future State to select, subject to the approval of the Secretary of the Interior, from the lands of the United States nearest to the tiers of sections above specified, so much land, in alternate sections, or parts of sections, as shall be equal to such lands as the United States have sold, or otherwise appropriated, or to which the rights of preëmption have attached, as aforesaid; which lands (thus selected in lieu of those sold, and to which preëmption rights have attached as aforesaid, together with the sections and parts of sections designated by odd numbers as aforesaid, and appropriated as aforesaid) shall be held by the Territory or future State of Minnesota for the use and purpose aforesaid."

The Minnesota and Pacific Railroad Company was organized as a railroad corporation under and pursuant to an act of the legislature of the Territory, now State, of Minnesota, approved May 22, 1857. The St. Paul and Pacific Railroad Company was organized in conformity to an act of the legislature of the State, approved March 10, 1862, and, under and by virtue of that act, became the owner of all the lines of

railroad formerly owned by the Minnesota and Pacific Railroad Company, and also of the lands granted to the Territory, now State, of Minnesota, to aid in the construction of the branch line of railroad from St. Anthony northward to St. Cloud, under the act of Congress of March 3, 1857. On February 6, 1864, the First Division of the St. Paul and Pacific Railroad was organized for railroad purposes, which organization was confirmed by act of the legislature of the State, approved February 6, 1866, and said First Division succeeded to all the rights, privileges, and lands possessed or granted to the Minnesota and Pacific Railroad Company or to the St. Paul and Pacific Railroad Company, as its successor, in any way pertaining to the branch line.

The line of the branch railroad was definitely fixed, and a map thereof filed with the Secretary of the Interior, December 30, 1857, and the land in controversy is part of an odd section within six miles of said branch line, being section 13, township 124 N., range 28 W. This section was certified to the State of Minnesota by the Secretary of the Interior, October 25, 1864, as a part of the land granted by the act of Congress of March 3, 1857. The branch line of railroad was constructed from St. Anthony to St. Cloud, opposite the land in controversy, during September, 1866, and plaintiff in error had acquired all the right and title to the land described in the complaint that was ever possessed by the Territory or State of Minnesota, or the First Division of the St. Paul and Pacific Railroad Company.

George F. Brott on September 9, 1855, entered into a contract with the United States to carry the mail from Minneapolis to supply the offices at St. Cloud, Monticello, and Dayton. This route was about sixty-five miles in length, and the contract said: " The route from Minneapolis by Dayton to Monticello and St. Cloud aforesaid, is to be deemed and considered a post road during the continuance of this contract."

By act of Congress of March 3, 1855, c. 201, 10 Stat. 683, 684, it was provided that: " Each contractor engaged, or to be engaged, in carrying mails through any of the Territories

west of the Mississippi, shall have the privilege of occupying stations at the rate of not more than one for every twenty miles of the route on which he carries a mail, and shall have a preëmptive right therein, when the same shall be brought into market, to the extent of six hundred and forty acres to be taken contiguously, and to include his improvement." As mail contractor, Brott, in 1855, selected for and built and established his mail station upon section 13, which station consisted of stable and building for the use of his teams and carriages, and maintained the same throughout the term of his mail contract. Brott's route terminated at St. Cloud, and no mail was carried west from there under the United States government until the latter part of the year 1856, or some time in 1857.

August 7, 1857, Brott made application to the United States land office at St. Cloud to file a preëmption declaratory statement for the southwest quarter of the northwest quarter of said section 13, township 124, range 28, which embraced the land in controversy, with other lands, claiming the right to preëmpt the same, as a mail contractor, under the act of March 3, 1855. This application was by the decision of the local land officers rejected, and from such decision Brott appealed to the Commissioner of the General Land Office, by whom the decision of the local land officers was sustained. Brott thereupon appealed to the Secretary of the Interior, who reversed the Commissioner's decision, on August 30, 1861, and held that Brott should be permitted to enter the tracts mentioned in his application upon the production of proof of the performance of his mail contract and of the occupation of the stations, and upon compliance with the laws and regulations in other respects applicable to the case. On May 26, 1860, Congress passed an act, entitled "An act for the relief of George F. Brott," providing, 12 Stat. 843, c. 63 : "That George F. Brott be, and he is hereby, authorized to enter the following described lands, to wit : [omitting description which includes that in dispute] in the district of lands subject to sale at the land office at St. Cloud, Minnesota; said tracts containing five hundred and sixty-two and twenty hundredths

acres, upon the payment by the said Brott of the usual minimum of one dollar and twenty-five cents per acre therefor: *Provided,* That said entry shall in nowise interfere with or embrace any land to which there is a valid subsisting claim under the preëmption laws of the United States; and the Commissioner of the General Land Office is directed to issue a patent on said entry."

No further effort was made by Brott to enter the land simply as such mail contractor, but the entry of the same was thereafter made by him under and in pursuance of the act of Congress passed for his relief, he paying for the land the sum specified.

In July, 1871, a patent for the land issued from the United States to Brott in the usual form, except that it was stated therein that the land had been certified to the State of Minnesota for railroad purposes by mistake. The defendant at the time of the commencement of the action had and was seized of all the right and title to the lots in controversy that Brott ever had or possessed under his patent, and claimed his right to such title under and by virtue of mesne conveyances duly made, executed, and delivered by and through Brott and his grantees and duly recorded.

*Mr. M. D. Grover* for plaintiff in error.

No appearance for defendant in error.

Mr. Chief Justice Fuller, after stating the case, delivered the opinion of the court.

The line of the road was definitely fixed December 30, 1857; the lands within the place limits then subject to the grant were thereby segregated from the public domain; and the grant took effect thereon. But under the granting act, lands to which preëmption rights had attached, when the line was definitely fixed, were as much excepted therefrom as if in a deed they had been excluded by the terms of the conveyance. And this was true in respect of applications for preëmption

rejected by the local land office and pending on appeal in the land department at the time of definite location, since the initiation of the inchoate right to the land would prevent the passage of title by the grant, and the determination of its final destination would rest with the government and the claimant. *Railway Company* v. *Dunmeyer*, 113 U. S. 629; *Railroad Company* v. *Whitney*, 132 U. S. 357; *Bardon* v. *Railroad Company*, 145 U. S. 535; *Ard* v. *Brandon*, 156 U. S. 537; *Whitney* v. *Taylor*, 158 U. S. 85. Brott selected certain lands, including this in dispute, for and built and established his mail stations thereon in 1855 and maintained the same during the term of his mail contract; and filed his application to enter these lands, as a mail contractor under the act of March 3, 1855, in the local land office August 11, 1857. The application was rejected by the local land officers; and Brott appealed to the Commissioner of the General Land Office, and from his decision to the Secretary of the Interior, who reversed the rulings of the land officers and of the Commissioner, and held Brott entitled to preëmpt the stations occupied. He was, indeed, required to produce proof of the performance of his mail contract and of the occupation of the lands as stations, and he actually entered them in pursuance of the act of Congress for his relief, but in *Ard* v. *Brandon, supra*, it was held that when a preëmptor has the right to make entry, and applies to the local land officers and they refuse to recognize his right, it will be deemed to date from the time of his application, and this notwithstanding he proceeds to obtain title in some other way. The conclusion follows that Brott's preëmption claim must be regarded as having attached prior to the definite location, December 30, 1857, and that the title did not pass under the Congressional grant to the State.

But it is contended that as on October 25, 1864, the Secretary of the Interior included section 13 in the lists of lands certified to the State of Minnesota under the act of August 3, 1854, (10 Stat. 346,) as a part of the lands granted by the act of March 3, 1857, that certification was an adjudication that the land in question had not been previously disposed of, and that no preëmption right had attached thereto, and passed the

legal title, whatever Brott's equitable rights might be; and that while the certification might be voidable, it was not absolutely void. The act of August 3, 1854, provided that where lands had been or should be thereafter granted to the several States or Territories, and the law did not convey the fee simple title of such lands or require patents to be issued therefor, the lists of such lands which had been, or might thereafter be certified, "shall be regarded as conveying the fee simple of all the lands embraced in such lists that are of the character contemplated by such act of Congress, and intended to be granted thereby; but where lands embraced in such lists are not of the character embraced by such acts of Congress, and are not intended to be granted thereby, said lists, so far as these lands are concerned, shall be perfectly null and void, and no right, title, claim, or interest shall be conveyed thereby."

As we have seen, this particular land was not included in the grant, and the Secretary of the Interior had so decided on August 30, 1861, when he determined that the preëmption right had attached. And since it was not so included nor subject to disposition as part of the public domain, on October 25, 1864, the action of the land department in including it within the lists certified on that day was ineffectual. *Noble* v. *Railroad Co.*, 147 U. S. 165, 174.

The distinctions between void and voidable acts need not be discussed. It is rarely that things are wholly void and without force and effect as to all persons and for all purposes, and incapable of being made otherwise. Things are voidable which are valid and effectual until they are avoided by some act; while things are often said to be void which are without validity until confirmed. 8 Bac. Abr. Void and Voidable; *Ewell* v. *Daggs*, 108 U. S. 143; *Ex parte Lange*, 18 Wall. 163; *State* v. *Richmond*, 6 Foster (N. H.) 232; *Anderson* v. *Roberts*, 18 Johns. 515; *Pearsoll* v. *Chapin*, 44 Penn. St. 9.

As against Brott the certification had no operative effect.

It is also objected that Brott was not a qualified claimant under the act of 1855, because that act only applied to a contractor engaged in carrying the mail through any of the Terri-

tories west of the Mississippi, and because it does not appear that his declaratory statement was ever accepted or recognized, or that he made proof of his occupation of the land as a mail station, but these and other like objections involve questions between Brott and the government, already determined in his favor, and which the railroad company and its grantees are not in a position to raise upon this record.

*Judgment affirmed.*